**Marilyn REVIS, Plaintiff,**

v.

**SLOCOMB INDUSTRIES, INC., Defendant.**

**Civ. A. No. 91–25 MMS.**

United States District Court, D. Delaware.

Feb. 19, 1993.

Donna L. Schoenbeck of Schoenbeck & Schoenbeck, P.A., Wilmington, DE, for plaintiff.

Barry M. Willoughby, and Bahavana Sontakay, of Young, Conaway, Stargatt & Taylor, Wilmington, DE, for defendant.

## OPINION

MURRY M. SCHWARTZ, Senior District Judge.

Defendant, Slocomb Industries, has moved for summary judgment in this civil rights case. The plaintiff, Marilyn Revis, has claimed discrimination in promotion under 42 U.S.C. § 1981 (1988) and under Title VII, 42 U.S.C. § 2000e–2(a)(2) (1988). Docket Item (D.I.) 4. She has also alleged Title VII violations of retaliatory discharge and racial harassment at Slocomb Industries. 42 U.S.C. § 2000e et seq. (1988).[1] This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (1988).

For the reasons which follow, the defendant's motion for summary judgment will be granted with respect to the plaintiff's claim under section 1981 and on her hostile working environment claim under Title VII. The defendant's motion on the plaintiff's claim of discriminatory denial of promotion and retaliatory discharge under Title VII will be denied.

### I. *Facts*

The plaintiff, Marilyn Revis, is a black woman who had worked for the defendant, Slocomb Industries, for approximately six years. On June 23, 1989, the defendant dismissed the plaintiff.

Over the course of those six years, the plaintiff's position at Slocomb Industries in-

---

1. The plaintiff has also alleged a violation of § 1981 because of a racially hostile work environment. D.I. 4 at ¶¶ 27–30. The only support offered for the position is that the 1991 Civil Rights Act should be applied retroactively. As this Court has previously determined the Act should only be applied prospectively, she cannot prevail on this aspect of her § 1981 claim. *Crumley v. Delaware State College,* 797 F.Supp. 341 (D.Del.1992).

volved various tasks. Her supervisor, Ms. Doris Thomas, described the plaintiff's job as "doing a little bit of everything; i.e., accounts payable, accounts receivable, payroll, pickup clerk, etc." D.I. 48 at 58. The record reflects her "making coffee for the crew" as well as "doing pickup work for the customers". D.I. 48 at 13. At times, she would assist her supervisor in making credit judgments. *Id.* at 39.

The promotion claim stems, in part, from the position taken by the direct supervisor of plaintiff, Ms. Thomas, who was at management meetings where potential restructuring of the company was discussed. D.I. 48 at 58–59. Ms. Thomas suggested the creation of a personnel department and proposed the plaintiff as its manager. *Id.* Neither the new department, nor the new position, referred to as the "Human Resources Manager", was ever created. D.I. 46 at 55.

At one such management meeting, Ms. Margaret Slocomb, the defendant's Credit/Benefits Manager, pointed out that she needed a replacement for an assistant who had transferred in November of 1988. *Id.* at 61. In contrast to the Human Resources position which never was created, the position of Assistant to the Credit/Benefits Manager existed prior to that time, and continues to exist. The vacancy was subsequently filled by hiring Ms. Cecelia Damiani, a white woman.[2] D.I. 48 at 36–37. Confusion, however, arises over the precise duties of this Assistant position and the putative Human Resources Manager position.

Margaret Slocomb herself was the "Credit/Benefits Manager". According to Ms. Thomas, the assistant position was one that entailed training for Ms. Slocomb's position. D.I. 48 at 37.[3] The plaintiff, however, described it as "jobs that I was doing at present...." D.I. 48 at 46; D.I. 53 at 40. Among the tasks plaintiff included as these "jobs" were, "interviewing new employees, Christmas Club, profit sharing ... calling for

credit, credit approval, intervening with some of the contractors...." D.I. 53 at 42.

The duties of the proposed Human Resources position would have somewhat overlapped these duties. The plaintiff described those duties as overseeing "the intake of new employees ... problems with medical benefits, problems with payroll, anything the front office needed to know were handled through the employee." D.I. 48 at 47. In addition, the position would have had some involvement with employee discipline. *Id.* at 48. According to plaintiff, "most of the work that was supposed to be done by this Human Resources Manager was being done by Ceil." D.I. 48 at 46. The Human Resources position itself, however, "was completely thrown out." D.I. 46 at 68.

It is unclear whether plaintiff applied for the Assistant Credit/Benefits position. The plaintiff, in her deposition, concedes that she did not "directly" tell Leon Slocomb, the president of Slocomb Industries, that she wanted the position, but had told Ms. Thomas something about her interest. D.I. 53 at 38–39. Plaintiff believed she had expressed to Ms. Thomas an interest in "fifty percent" of the position as assistant to Ms. Slocomb. D.I. 46 at 53; D.I. 53 at 40. At her deposition, Ms. Thomas said she had "not specifically" recommended the plaintiff to the assistant manager's position. D.I. 48 at 49; D.I. 46 at 52.

In a statement given to the Equal Employment Opportunity Commission (the EEOC), Ms. Thomas appeared to assume plaintiff had applied for the position when, referring to the assistant position, she said, "I believe that Marilyn was denied the position because she was black." D.I. 48 at 63. While Ms. Thomas does not provide specific reasons for her conclusion, earlier in the statement she mentions comments made by Ms. Slocomb which reflect a racial animus. For instance, Ms. Slocomb apparently once asked Ms. Thomas "Can you see us having a management meeting with a Black person there?" *Id.* at 60.[4]

2. At various times, Ms. Damiani has been referred to as "Ceil", D.I. 48 at 46, or "Cecilia", D.I. 48 at 63.

3. The position to which Ms. Damiani applied was "Credit/Benefits Manager". D.I. 48 at Tab E.

4. Beyond Ms. Slocomb's comments, there is little direct evidence of racism at Slocomb Industries.

The confusion surrounding whether plaintiff applied for the position rests, in part, on the defendant's failure to post the position's opening. D.I. 48 at 61. Because the position was not posted, plaintiff did not know the title of the position until after it had been won by another. D.I. 48 at 46. Ms. Thomas, while not disputing that the position lacked a clear name, stated that knowledge of the opening as Ms. Slocomb's assistant was "common knowledge within the company". D.I. 48 at 27.

At or about the time period in which this position was filled, things were not going well at Slocomb Industries vis-a-vis the plaintiff. The first signs of this tension appear in the record over both the hiring of Ms. Damiani in February and the pay raise which plaintiff received in April, 1989. Ms. Damiani applied, and was hired for, the position on February 13, 1989. D.I. 48 at Tab E. On that same day, plaintiff visited the EEOC office and completed a discrimination charge. D.I. 48 at 55. She did not sign the charge, however, because she was "skeptical about going to court" and "scared for [her] job". D.I. 48 at 56.

While the unsigned charge waited at the EEOC, plaintiff continued to work. Indeed, in April of 1989 she received a pay raise. D.I. 48 at Tab B. The raise, authorized by Leon Slocomb, elevated the plaintiff's pay from $367.00 a week to $400.00 a week. *Id.* The supervisor, Ms. Thomas, suggested in her EEOC statement that the raise was reluctantly approved and only occurred at her insistence. D.I. 48 at 60–61.

In a somewhat strange twist of events, Ms. Thomas apparently attempted to convince the plaintiff that Mr. Slocomb had no bias against her by tape recording a conversation between Mr. Slocomb and Ms. Thomas. According to the statement Ms. Thomas gave to the EEOC, the tape was made on May 9, 1989. Mr. Slocomb did not know the conversation was being recorded and the full content of the tape is not known. In the EEOC

statement, Ms. Thomas does recall Mr. Slocomb explaining, "I'm not the white horse in shining armor who comes to save the Black race, I have all the people in this office to answer to." D.I. 48 at 64. Because of an emergency involving her son, Ms. Thomas had to leave and gave the tape to the plaintiff.

Shortly after the taping incident, the plaintiff returned to the EEOC office and signed her complaint on May 12, 1989. D.I. 46 at Tab 1. The EEOC complaint alleged a denial of promotion to the position of "Human Resources Manager". In her deposition, the plaintiff explained some confusion which occurred at the EEOC over the identity of the position to which plaintiff had allegedly been denied promotion. In determining which position should be named in the EEOC charge, plaintiff explained, "I really didn't know what to say because the position was told to me by Doris that it was going to be Human Resources Manager and when it came about it came about something different. So, [the EEOC investigator] said well I'll type Human Resources Manager." D.I. 53 at 43.

After signing the EEOC charge, the plaintiff returned to work and apparently talked with some other employees about her pending complaint. In her deposition, co-worker Linda Blackledge stated that she knew plaintiff had filed a "racial discrimination charge". D.I. 56 at 37. Plaintiff had told her of this approximately one month before plaintiff was dismissed. *Id.* at 38. Ms. Blackledge, in turn, spoke about the charge with a number of other employees, including Wanda Rodriguez who promised not to tell anybody else. *Id.* at 38–40. Although Wanda Rodriguez had for seven years been dating Chris Slocomb, the son of the defendant's president and manager of the glass room, she stated in her deposition that she had not discussed the plaintiff with Chris Slocomb. D.I. 57 at 24–27.

After May 12, 1989, the plaintiff began to receive written "Employee Warnings", not

---

Plaintiff has in the record an admission by Leon Slocomb that Slocomb Industries used codes to signal which were black applicants. D.I. 48 at 80. The plaintiff has alleged that defendant maintained a sparse black representation among

its managers, D.I. 4 at ¶ 10(a), but has only placed in the summary judgment record when certain black managers have been employed by defendant. D.I. 48 at 79.

from her immediate supervisor, but from the defendant's Chief Financial Officer, Carl Henze. D.I. 48 at Tab A.[5] She received two on May 19, one on June 7, and an informal written memo on June 15, written by Margaret Slocomb. In one warning entered on May 19, plaintiff was written up for arriving four minutes late to work. The report included the warning that the next violation would result in termination.

Subsequent to the taping of Leon Slocomb, the plaintiff herself apparently recorded a conversation with Carl Henze. D.I. 48 at 63. Plaintiff also began playing the tape for other employees. D.I. 46 at 113–120. On June 20, 1989, the defendant held a management meeting at which it was determined to dismiss the plaintiff. D.I. 46 at Tabs 7–14. On June 21, 1989, the defendant received from the EEOC a notice of plaintiff's charges. D.I. 46 at Tab 1. Apparently due to the recent employee warnings, plaintiff had been on a three-day suspension. When she returned on June 23, she was dismissed.

On June 26, 1989, plaintiff filed with the EEOC an additional charge, based on her race and retaliation. D.I. 53 at Tab 2. On this and her previous charge, the EEOC determined that the evidence did not establish probable cause to find violations of the statute. D.I. 46 at Tabs 2, 3.

II. *Summary Judgment*

The defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56 requires the Court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. 56(c).

An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "As to

materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

■ Where there is a dispute, the non-moving party must place in the record sufficient evidence for the Court to find a genuine issue of material fact.

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The standard is not satisfied if the non-movant provides merely a scintilla of evidence supporting its position. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. at 2512. The Court will enter summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552.

■ It is not the Court's task to replace the rational trier of fact and to resolve questions about which genuine issues exist. The Court will only enter summary judgment if no rational trier of fact could weigh the evidence and find for the nonmoving party. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

Addressing summary judgment in discrimination cases, the United States Court of Appeals for the Third Circuit has explained a court's role is "to determine whether, upon

---

**5.** *On her subsequent EEOC complaints, the* plaintiff claimed to have been written up five times in one and a half months, including one suspension. D.I. 53 at Tab 2. Presumably, this

*time span refers to the time between May 12 (the date of her first EEOC complaint) and June 23 (the date of her dismissal).*

viewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987).

### III. *Analysis*

#### A. Denial of Promotion—Section 1981

■ Plaintiff has alleged a racially discriminatory denial of promotion under section 1981. Two positions have been mentioned in plaintiff's claim: the "Human Resources Manager" and the "Assistant Benefits/Credit Manager". The defendant never created a position with the title "Human Resources Manager". The Court finds that the plaintiff could not possibly have been denied promotion to the position of "Human Resources Manager", a position which did not exist, and does not exist, at Slocomb Industries. Because the position of "Human Resources Manager" has never existed, the record is far from clear as to what the duties of the "Human Resources Manager" would have been. Accordingly, the analysis of both the section 1981 claim and the Title VII claim will focus on the "Assistant Credit/Benefits Manager" position. However, because of an apparent overlap in the duties of the proposed "Human Resources Manager" any facts in the record which bear upon the Human Resources Manager will be considered if appropriate. *See* D.I. 48 at 46 (plaintiff's deposition testimony explaining that the Assistant Credit/Benefits Manager position involved "most of the work that was supposed to be done by this 'Human Resources Manager'....").

■ Section 1981 of the Civil Rights Act of 1866 states, in part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts...." 42 U.S.C. § 1981. The jurisprudence of section 1981 changed with the Supreme Court's opin-ion in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In *Patterson*, the Court found that a section 1981 claim could only be made with a showing of a "new and distinct relation between the employee and the employer...." *Id.* at 185, 109 S.Ct. at 2377. Not all promotions create a "new and distinct relation", and any section 1981 claim for denial of promotion must now address this fundamental issue. The United States Court of Appeals for the Third Circuit addressed the *Patterson* decision and a section 1981 claim for denial of promotion in *Bennun v. Rutgers State Univ.*, 941 F.2d 154 (3d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992).

> In *Bennun*, the Court of Appeals, stated: We agree with Rutgers' criticism of the district court's use of the value, stigma and perception factors. None of them indicate the creation of a new contract because they do not touch any of the terms of the contract as to duties, tenure, compensation or essential function.... Holders of these two positions [Associate and Full Professors] do nothing different day-in and day-out except for those few weeks of the year when they evaluate candidates, if any, for full professorship.

*Id.* at 169.[6] The appellate court's focus makes clear that when addressing section 1981 claims in the Third Circuit, courts must avoid the vague and subjective factors such as "perception" or "value" or "stigma" and focus upon the "day-in and day-out" duties and responsibilities which different positions entail.

■ Applying *Bennun* and *Patterson* to the facts of this case, the plaintiff has failed to show that a new and distinct relationship would have been created if she had been chosen to take the position which Cecelia Damiani filled. Comparing the "day-in and day-out" duties and responsibilities of the "Assistant Credit/Benefits Manager" with her own position, the plaintiff explained that the former position involved "most of what I was doing at the time" and "jobs that I was

---

6. With respect to the evaluation of candidates for full professor, the Court found it "the single difference between the two positions." *Id.*

doing at the present". D.I. 53 at 40; D.I. 48 at 46. These descriptions, taken from the plaintiff's own words, preclude this Court from finding that a new and distinct relationship would have been formed if the plaintiff had secured the "Assistant Credit/Benefits Manager" position. For this reason, plaintiff's section 1981 claim must fail and defendant's motion for summary judgment will be granted.

### B. Denial of Promotion—Title VII

In response to the plaintiff's claim of denial of promotion under Title VII, the defendant first argues that plaintiff did not properly file her claim with the EEOC, and second, that plaintiff has failed to establish a prima facie case.

#### 1. *Scope of the EEOC Charge*

■ In its first argument, defendant maintains that the plaintiff's Title VII claim for denial of promotion must fail because the plaintiff did not file administrative charges with respect to the position she sought. As to the scope of a Title VII claim in district court, the Court of Appeals for the Third Circuit has said,

> the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the Commission.

*Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753, *reh'g denied*, 430 U.S. 911, 97 S.Ct. 1187, 51 L.Ed.2d 589 (1977) (citations omitted), *quoted in Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir.1984). By way of explanation, the Court in *Howze* explained "a district court may assume jurisdiction over additional charges if they are reasonably within the scope of the complaint's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims." *Howze*, 750 F.2d at 1212. This standard must be read in light of the "sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the mer-

its." *Gooding v. Warner–Lambert Co.*, 744 F.2d 354, 358–359 (3d Cir.1984) (citations omitted).

The Court is unwilling to find as a matter of law that the plaintiff's claim here does not qualify under the above standard. Her charge with the EEOC did state that she had applied for the position of Human Resources Manager, a position which was never actually created. The only position for which she could have been denied a promotion was the Assistant Credit/Benefits Manager position. Since that is the only position at issue, the question becomes whether or not a reasonable investigation of her EEOC charge would have led to facts surrounding that denial of promotion.

The Court finds that a reasonable investigation would have revealed the denial of promotion to the Assistant Credit/Benefits Manager position. First, when initiating the EEOC charge, the plaintiff explained, "I really didn't know what to say because the position was told to me by Doris that it was going to be Human Resources Manager and when it came about it came about something different. So, [the EEOC investigator] said well I'll type Human Resources Manager." D.I. 53 at 43. The confusion of a civil rights plaintiff who has not been schooled in this area of law should not preclude her attempt to pursue her claim.

Second, in the statement given to the EEOC by Doris Thomas, the plaintiff's supervisor, Ms. Thomas describes the process through which the Assistant Credit/Benefits Manager position had been filled:

> Margaret [the Credit/Benefits Manager] stated that she would pay [her former assistant's] replacement whatever she had to in order to find someone sufficient. I believe that Marilyn was denied the position because she was black. I believe Marilyn was efficient, she was furthering her education and had everything going for her; was dependable and capable of doing the job. My understanding was that Margaret hired Cecilia [sic] (last name unknown) as Assistant Personal [sic] and Credit Manager. In my opinion, Cecilia [sic] was not qualified for the position, but

because she was a friend of the family's she was hired for the position.

D.I. 48 at 63. Faced with the statement of a supervisor that a plaintiff had been denied a position "because she was black", it is difficult to see how an EEOC investigator would not inquire into the denial of such a position. Any individual doing a reasonable investigation of a denial of promotion claim who read or heard this statement would be led to investigate the events surrounding the hiring of the Assistant Credit/Benefits Manager at Slocomb Industries.

### 2. Failure to Apply

The defendant also argues that plaintiff has failed to state a prima facie case for denial of promotion under Title VII.[7] Title VII claims are analyzed in terms of shifting burdens. The analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973), requires plaintiff to establish a prima facie case, followed by the employer's burden of production to show a legitimate non-discriminatory reason, and ending with the plaintiff's ultimate burden of persuasion to show the employer's proffered reason was nothing more than pretext. Throughout this analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Af-*

*fairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

The Supreme Court originally articulated the elements of the prima facie case in *McDonnell Douglas*. Plaintiff must show:

(i) that he belongs to racial minority; (ii) that he applied and was qualified for a job for which his employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant argues that plaintiff has not made out a prima facie case because she did not apply for promotion to the position of "Assistant Benefits/Credit Manager".

■ Noting that "courts need not, and should not, stubbornly analyze all Title VII factual scenarios through the *McDonnell Douglas* formula", the Third Circuit appellate court has found the necessity of showing an application occurred is satisfied "as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer." *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir.1990).[8] *See also Ferguson v. E.I. du Pont de Nemours & Co.*, 560 F.Supp. 1172, 1192–1193 (D.Del.1983) (finding no failure to apply because plaintiff had expressed a "generalized interest" in promotion).

---

7. At one time, the law in the Third Circuit was that the legal standards governing Title VII and § 1981 were interchangeable. *See e.g., Gunby v. Pennsylvania Elec. Co.*, 840 F.2d 1108, 1115 n. 9 (3d Cir.1988), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). Because of changes discussed above in the interpretation of section 1981, that proposition is no longer completely accurate. While the impact of the *Patterson* decision on the interchangeability of the legal standards was not discussed in *Bennun*, the Court's holding that a cognizable section 1981 claim had not been made did not deter it from proceeding to affirm liability under Title VII. *Bennun*, 941 F.2d at 180. The analysis in *Bennun* makes clear that the legal standards governing section 1981 and Title VII are no longer identical. Because the decision in *Bennun* allowed a plaintiff who does not have a section 1981 claim to assert a Title VII claim, the Court will address the plaintiff's Title VII claim.

8. The Court of Appeals' flexible approach to the *McDonnell Douglas* analysis is in accord with the Supreme Court's own treatment. *See McDonnell Douglas*, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13 ("[t]he facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect to differing factual situations."); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("The prima facie case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized or ritualistic. Rather it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question 'of discrimination.' ") (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)).

■ The defendant's argument that the plaintiff has failed to make out a prima facie case is unpersuasive. This is not a case in which the plaintiff made no effort whatsoever to communicate her views to management. While the plaintiff admitted in deposition testimony that she had not "directly" told President Slocomb about her interest in the position, she had expressed to her supervisor an interest in advancement. D.I. 53 at 38–39. In addition, Ms. Thomas's statement to the EEOC, that it was her belief that plaintiff was denied the position because of her race, raises the inference that Ms. Thomas communicated plaintiff's interest in the position to upper management. Given these circumstances, there is a strong inference that defendant knew plaintiff was interested in the non-posted position. Accordingly, plaintiff's Title VII claim based upon a failure to promote survives defendant's motion for summary judgment.[9]

## C. Retaliatory Discharge

■ The provision in Title VII which gives rise to claims for retaliatory discharge states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [an employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). The Court of Appeals for the Third Circuit has held that the shifting burdens analysis articulated in *McDonnell Douglas* applies to claims of retaliatory conduct. *Waddell v. Small Tube Prod., Inc.*, 799 F.2d 69, 73 (3d Cir.1986). In a subsequent case, the Court of Appeals listed the elements required of a plaintiff to show a prima facie case:

> To establish a prima facie case, plaintiff must show (1) that he engaged in protected activity; (2) that he was discharged subsequent to or contemporaneously with such activity; and (3) that a casual link exists between the protected activity and the discharge.

*Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990).

The defendant argues that the plaintiff has not shown causation, the third element of the prima facie case. Defendant's position is that the statute could not have been violated because no one in management at Slocomb Industries knew about the pending EEOC charge when they decided to discharge the plaintiff. The only issue is whether the persons who assembled at the June 20 management meeting and participated in the decision to dismiss plaintiff knew about the pending EEOC action.

---

9. Within her claim for denial of promotion, the plaintiff alleges a "policy and practice of discriminating in employment against blacks." D.I. 4 at ¶ 10. The plaintiff has cited no case law in rebutting defendant's motion for summary judgment. The term "pattern and practice" is not contained in 42 U.S.C. § 2000e–2(a), which is the statutory premise of plaintiff's denial of promotion claim. The term "pattern or practice" does appear in 42 U.S.C. § 2000e–6, which authorizes actions by the Attorney General. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 328, 335, 97 S.Ct. 1843, 1851, 1854, 52 L.Ed.2d 396 (1977). Outside the context of § 2000e–6, the term has been utilized in the analysis of other Title VII theories of discrimination. *See, e.g., Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 524, 542–43 (3d Cir.1992) (explaining that "[s]tatistical evidence of an employer's pattern or practice with respect to minority employment may be relevant to a showing of pretext" in a failure to promote case).

To the extent plaintiff is attempting to assert a policy and practice of discrimination to support a recognized theory of Title VII, the evidence in the record does not support her assertion. The allegation of sparse black representation in management is unsupported by evidence of disparity such as who had applied, who had been qualified, or who had been promoted. While it does appear that defendant coded applications to signal black applicants, D.I. 48 at 80, plaintiff has done nothing to show the effect of this coding nor has plaintiff disputed defendant's explanation that it was only an attempt to recruit a black employee for a certain division. Finally, any racial comment made by Ms. Margaret Slocomb, *see e.g.,* D.I. 48 at 60, while it may assist plaintiff in showing discriminatory denial of promotion, does not in itself amount to a pattern or practice of discrimination. *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855 (requiring "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts").

Neither party has placed anything in the record which directly addresses what the people at the June 20 meeting knew or did not know about the EEOC complaint. The defendant has placed into the record seven affidavits of people who attended the June 20 management meeting. D.I. 46 at Tabs 7–13. All seven affidavits explain that the decision to fire the plaintiff was made on June 20. Two of the affidavits state that the EEOC notice was not received until June 21. D.I. 46 at Tabs 7, 8. Nowhere, however, in any of those seven affidavits does any member of the management state that he or she did not know about the EEOC charge. At best, they merely recite the dates upon which the notice was received and state that the dismissal was not done in retaliation.

To raise an inference that at least one person at the meeting knew about the pending EEOC charge, the plaintiff has submitted the deposition testimony of Wanda Rodriguez and Linda Blackledge. Reduced to its essentials that testimony may be summarized as follows: (1) Ms. Rodriguez knew about the EEOC charge. D.I. 56 at 39; (2) for a number of years, Ms. Rodriguez had been dating Chris Slocomb who was glass room manager at Slocomb Industries and the son of Leon Slocomb, the defendant's president. D.I. 57 at 24–25; (3) Ms. Rodriguez denied telling Chris Slocomb about plaintiff's filing the charge with the EEOC. D.I. 57 at 26–27. Notwithstanding the denial, a jury could choose to disbelieve Ms. Rodriguez and find that Ms. Rodriguez would have told Chris Slocomb about the charge, and that the son would relay the information to the father, who was present at the meeting.

Because there is an inference that Leon Slocomb knew about the pending EEOC charge, the issue of retaliation revolves around the credibility of Ms. Rodriguez. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. As the notes to Rule 56 state, "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed.R.Civ.P. 56 advisory committee's note. Under this standard, it is not the Court's role to decide issues of credibility, and for this reason, summary judgment will be denied as to plaintiff's claim of retaliatory discharge under Title VII.

### D.  Racial Harassment

█  Plaintiff asserts that certain conduct of the defendant amounts to racial harassment. In her brief, plaintiff equates racial harassment with hostile work environment. D.I. 47 at 17–18. The defendant argues that this claim is precluded because a hostile work environment charge was not included in the EEOC complaint.

The Court is not prepared to say that a hostile work environment claim could never be "reasonably be expected to grow out of" other discrimination claims as a matter of law. *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d at 398–99. However, this case does not present a factual scenario in which a hostile work environment claim "reasonably be expected to grow out of" plaintiff's EEOC charge.

The EEOC charge mentions only that plaintiff had been written up five times and suspended. In light of these acts mentioned in the EEOC charge, all the EEOC would have investigated would have been the employee warnings about which plaintiff had complained. On its face, five warnings in approximately six weeks would not have led to an investigation about a racially hostile work environment. For this reason, it is held the plaintiff's racial harassment claim falls outside the permissible scope of the EEOC charge.

Even if the EEOC complaint can be read reasonably to lead to a racially hostile work environment claim, the facts do not meet the standard required to make such a claim. The United States Court of Appeals for the Third Circuit has articulated a five part test for establishing a successful hostile work environment claim:

(1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affect-

ed the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 860 (3d Cir.1990) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990)). This test has been applied in the context of a racially hostile work environment. *Dickerson v. New Jersey, Dept. of Human Services*, 767 F.Supp. 605, 614–615 (D.N.J.1991).

With respect to the claims of this plaintiff, the crucial element of this test would appear to be the second element. As to it, the Third Circuit appellate court has said "[h]arassment is pervasive when 'incidents of harassment occur either in concert or with regularity.'" *Andrews*, 895 F.2d at 1484 (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987)). In *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), the Supreme Court stated "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982)).

Plaintiff has failed to include within the record "sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d at 440. Plaintiff has only presented evidence as to the sudden appearance of numerous written employee warnings and derogatory remarks made by senior management to plaintiff's supervisor. Taken as true these facts would not "alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee*, 682 F.2d at 904). Other courts have granted motions for summary judgment despite more egregious conduct. *Raley v. Board of St. Mary's County Comrs.*, 752 F.Supp. 1272, 1280 (D.Md.1990) (instances of physical contact as well as sexual innuendos found insufficient to survive a motion for

summary judgment); *Robertson v. Georgia Dept. of Corrections, Waycross Probation Office*, 725 F.Supp. 533, 538–539 (S.D.Ga.1989) (summary judgment granted despite facts that plaintiff had been placed in inferior office, had his files interfered with, and had heard racially demeaning comments). *Cf. Garvey v. Dickinson College*, 761 F.Supp. 1175, 1184–1185 (M.D.Pa.1991) (denying motion for summary judgment when plaintiff had provided examples of discrimination for over one year and alleging the discrimination had occurred towards herself and other females); *Smolsky v. Conrail*, 780 F.Supp. 283, 294–295 (E.D.Pa.1991) (denying motion for summary judgment when plaintiff had alleged harassment by her immediate supervisor over a three-month period, which included potential threats and remarks on plaintiff's physical attributes). The deficiencies in the record require that the Court grant defendant's motion for summary judgment on plaintiff's claim of a racially hostile work environment.

E. Waiver

■ The defendant asserts that even if plaintiff had ever been entitled to relief under Title VII, she waived her remedies of reinstatement and back pay. Defendant bases its waiver argument on this exchange in the deposition of the plaintiff:

Q: Am I correct that you do not want to return to employment at Slocomb?

A: Yes. You're right.

Q: And when did you reach that conclusion?

A: (later) When I was fired.

D.I. 46 at 79; lns. 10–17.

With respect to waivers of Title VII claims, the Supreme Court has said, "presumably an employee may waive his cause of action under Title VII as part of a voluntary settlement...." *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974). In a footnote, the Court went on to explain,

In this case petitioner and respondent did not enter into a voluntary settlement expressly conditioned on a waiver of petitioner's cause of action under Title VII. In determining the effectiveness of any such

waiver, a court would have to determine at the outset that the employee's consent to the settlement was voluntary and knowing. *Id.* at 52, n. 15, 94 S.Ct. at 1022, n. 15. Plaintiff's statement that she did not want to return to work was made at a deposition. She did not enter into any agreement with the defendant. The defendant does not claim that any voluntary settlement had been offered. Plaintiff was not even asked if she would waive the Title VII claims. Instead there only appears a single question at a deposition about whether plaintiff wanted to return to work. Her answer does not appear to be a "voluntary and knowing" waiver of her right to proceed with her Title VII action. *Moore v. Trump Casino–Hotel,* 676 F.Supp. 69, 71–72 (D.N.J.1987) (finding question of fact as to whether employee had been offered full back pay and noting no waiver of injunctive remedies).

## IV. *Conclusions*

For the foregoing reasons, the defendant's motion will be granted with respect to the plaintiff's claims under section 1981, and with respect to her claim under Title VII for a hostile working environment. The defendant's motion for summary judgment on the plaintiff's claim of discriminatory denial of promotion and retaliatory discharge under Title VII will be denied. An appropriate order will issue.